# Richmond.

## L. M. WILLIAMS ET ALS V. BARTLETT BOLLING.

### March 15, 1923.

1. AGENCY—*Brokers—Good Faith of Agent—Agent of Both Buyer and Seller.*—Nothing is better settled than that a man cannot be the agent of both the buyer and seller in the same transaction, without the intelligent consent of both. .

2. AGENCY—*Brokers—Good Faith—Agent Acting for Himself.*—Reliance upon the agent's integrity, fidelity, and ability, is the main consideration in the selection of agents, and so careful is the law in guarding this fiduciary relation that it will not allow an agent to act for himself and principal, nor to act for two principals on opposite sides in the same transaction. All such transactions are voidable and may be repudiated by the principal, without showing that he was injured. In such cases the amount of consideration, the absence of undue advantage and other like features are wholly immaterial. Nothing will defeat the principal's right of remedy except his own confirmation after full knowledge of all the facts. Actual injury is not the principle upon which the law holds such transactions voidable.

3. AGENCY—*Brokers—Agent Acting for Himself—Agent Acting for Both Buyer and Seller—Object of the Rule.*—The chief object of the principle, which forbids an agent to act both for buyer and seller or to act for himself, is not to compel restitution, where actual fraud has been committed, or unjust advantage gained, but is to prevent the agent from putting himself in the position in which to be honest is to be a strain upon him, and to elevate him to a position where he cannot be tempted to betray his principal.

4. AGENCY—*Brokers—Agent Acting for Himself—Agent Acting for Both Buyer and Seller—Discretion of Agent.*—The law prohibits the agent from acting in a dual capacity, and the rights of the principal will not be changed, nor the capacity of the agent enlarged, by the fact that the agent is not invested with discretion, but simply acts under an authority to purchase a particular article at a specified price, or to sell a particular article at the market price. In such case the agent cannot act for both buyer and seller, or buy from or sell to himself, and if he does, the transaction is voidable.

5. AGENCY—*Brokers—Agent Acting for Himself—Agent Acting for Both Buyer and Seller—Disclosure to Principal.*—It is the duty of the agent

to place his principal in full possession of the facts bearing upon his personal interest and relations to the subject and toward the prospective purchaser. It is not enough for the broker or agent to say that he thought his principal was advised as to all the facts, nor is it sufficient if he be able to point out circumstances from which an inference might be drawn that the principal knew or had means of knowledge. It may be true that the principal has suffered no injury by means of the ignorance of the facts, but the law makes no such inquiry.

6. AGENCY—*Brokers—Agent Acting in Dual Capacity—Burden of Proof.*— Where the agent acts in a dual capacity the burden of proof is on the agent to prove that the principal was fully informed as to all the facts within the agent's knowledge.

7. BROKERS—*Good Faith of Brokers—Broker Buying and Selling to Himself— Case at Bar.*—In the instant case plaintiff was a customer of defendants, who wrote him, advising him to sell 100 shares of Atlantic Coast Line stock and to buy the bonds and stock of the Georgia and Florida Railroad with the proceeds of the sale. In reply plaintiff authorized defendants to sell his Atlantic Coast Line stock at 109 or 110 and buy the Georgia and Florida bonds and stock. In executing this order defendants sold thirty-five shares of plaintiff's stock and bought sixty-five shares of it themselves. They did not buy any Georgia and Florida bonds and stock for plaintiff, but simply transferred Georgia and Florida bonds and stock of their own to plaintiff's account.

*Held:* That unless plaintiff ratified this transaction, it fell within the rule prohibiting a broker from acting for himself and his principal; and that the transaction was voidable and might be repudiated by the principal without showing that he was injured.

8. BROKERS—*Good Faith of Brokers—Broker Buying and Selling to Himself— Ratification—Case at Bar.*—In the instant case plaintiff had authorized defendants, brokers, to sell for him 100 shares of Atlantic Coast·Line stock at 109 or 110. The brokers sold thirty-five shares of plaintiff's stock and bought sixty-five shares of it themselves. The only information or knowledge that plaintiff had of this sale of stock was contained in a letter to the effect that defendants had sold the 100 shares of Atlantic Coast Line stock at $10,925.00

*Held:* That plaintiff had not ratified defendants' action in selling his sixty-five shares of stock to themselves.

9. BROKERS—*Good Faith of Brokers—Broker Buying and Selling to Himself—Ratification—Case at Bar.*—In the instant case plaintiff authorized defendants, his brokers, to sell 100 shares of Atlantic Coast Line stock at 109 or 110 and buy Georgia and Florida bonds and stock with the proceeds of the sale. Defendants in executing this order did not buy the Georgia and Florida bonds and stock from others, but simply transferred Georgia and Florida bonds and stock of their

own to plaintiff. Defendants claimed that plaintiff had ratified this transaction upon full information. Plaintiff's information consisted of a letter from defendants, in which they said they were organizing the Georgia and Florida Railway, written nearly two years before the transaction in question. Another circular sent by defendants to plaintiff at the time they advised plaintiff to buy the Georgia and Florida bonds and stock contained nothing to inform plaintiff that they owned any of these bonds, and in their letter advising plaintiff of the purchase of the bonds there was nothing to inform him that they owned the bonds, but a statement of account accompanying this letter contained this item: "We have today sold you $10,000 Georgia and Florida" bonds. Plaintiff in his evidence testified that he never noticed these words until counsel in preparing papers called his attention to them.

*Held:* As defendants relied on ratification by the plaintiff of defendants' acts, the burden of proof was on defendants to show that plaintiff ratified their acts after full knowledge of all the facts, and that defendants had not met this burden.

10. BROKERS—*Good Faith—Broker Acting as Both Buyer and Seller—Injury to Principal—Discretion of Broker—Case at Bar.*—In the instant case plaintiff authorized defendants, his brokers, to sell 100 shares of railroad stock at 109 or 110. In executing this order the brokers took sixty-five shares of the stock themselves. Defendants claimed that they were mere instruments in the performance of an appointed service and not fiduciaries in the performance of a trust, and that having sold the stock at a price authorized by the plaintiff, he had sustained no legal damage.

*Held:* That all such transactions are viodable and may be repudiated by the principal, without showing that he was injured.

11. BROKERS—*Good Faith—Broker Acting as Both Buyer and Seller—Discretion of Broker—Case at Bar.*—In the instant case plaintiff, on advice of his brokers, the defendants, authorized defendants to sell 100 shares of his railroad stock and invest the proceeds in the purchase of bonds of another railroad. In executing this commission the brokers took sixty-five shares of plaintiff's stock themselves and instead of buying the other stock merely transferred stock of their own to plaintiff. A letter from plaintiff to defendants in regard to the transaction showed that plaintiff regarded them as old and tried friends and expected them to decide for him what was best in the matter.

*Held:* That under these circumstances defendants were agents coupled with the duty of exercising their best judgment in the matter, and consequently were not mere instruments for the performance of an appointed service.

12. BROKERS—*Good Faith—Broker to Buy Selling to Principal—Disclosure—Case at Bar.*—In the instant case defendants, brokers, were author-

ized by plaintiff to buy certain stocks and bonds for him. In executing the commission the brokers sold plaintiff their own bonds and stock and claimed that letters and circulars addressed by them to plaintiff clearly and unequivocally conveyed the information that they proposed to sell and did sell him their own bonds and stock. Defendants relied upon a postscript in a letter from defendants to plaintiff advising the investment, which was as follows: "Let us hear from you promptly if you desire to avail yourself of this offer."

*Held:* That this postscript added no information to the letter on the subjct of defendants' ownership of the stock and bonds.

13. Brokers—*Good Faith—Broker to Buy Selling to Principal—Disclosure— Case at Bar:*—In the instant case defendants, brokers, were authorized by plaintiff to buy certain stocks and bonds for him. In executing the commission the brokers sold plaintiff their own bonds and stock and claimed that letters and circulars addressed by them to plaintiff clearly and unequivocally conveyed the information that they proposed to sell and did sell him their own bonds and stock. Defendants relied upon a paragraph in a letter from defendants to plaintiff, which was as follows: "We have given you this participation in the bankers syndicate, as we feel that it is very safe and should bring you good profits during the next twelve months."

*Held:* That this paragraph was not reasonably calculated to convey to the plaintiff the meaning that the transaction was a sale by defendants to plaintiff of securities belonging to them personally.

14. Brokers—*Good Faith—Broker to Buy Selling to Principal—Disclosure— Case at Bar.*—It was urged by defendants, brokers, that a memorandum accompanying their letter advising plaintiff of the execution of his order containing the words "sold you" the stock and bonds was sufficient to convey to plaintiff the information that the stock and bonds in question were the property of defendants, and further claimed that the testimony of plaintiff that when these words were pointed out to him at the time of bringing suit he was "utterly surprised," amounted to an admission that if he had read the memorandum he would have so understood it.

*Held:* That in view of the fact that the letter accompanying the memorandum was the source to which plaintiff would naturally look for information on the subject of the transaction, the contents of the memorandum, when reasonably construed along with the letters of defendants and in the light of other evidence, cannot be said to have been such as to convey to plaintiff that the bonds and stocks sold him were the property of the defendants.

15. Brokers—*Good Faith—Broker to Buy Selling to Principal—Disclosure.*— For a communication from an agent to his principal to be held to convey by inference the information that the agent is acting for himself or for a third person, the inference must be so obvious that

it is apparent that the principal "willfully shut his eyes to what he might readily and ought to have known."

16. BROKERS—*Good Faith—Broker to Buy Selling to Principal—Disclosure—Case at Bar.*—In the instant case defendants, brokers, claimed that plaintiff was fully informed that certain bonds and stocks bought by him through them as brokers were owned by defendants personally. Defendants urged that a memorandum accompanying a letter from them to plaintiff advising him of the purchase of the bonds and stock showed that no commission was charged by defendants, and therefore informed plaintiff that the transaction was not a purchase for him, but a sale to him by defendants personally.

*Held:* That plaintiff could not have reasonably expected that such a memorandum would set out the commissions charged.

17. AGENCY—*Brokers—Broker or Agent Acting for Himself—Damages.*—The well settled and salutary principle that a person who undertakes to act for another shall not, in the same matter, act for himself, results also in the other rule, that all profits made and advantage gained by the agent in the execution of the agency belong to the principal. And it matters not whether such profit or advantage be the result of the performance or the violation of the duty of the agent if it be the fruit of the agency.

Appeal from a decree of the Chancery Court of the city of Richmond. Decree for complainant. Defendants appeal.

*Affirmed.*

This is a suit in equity which was instituted by the appellee in December, 1917, for the rescission of a certain transaction which transpired in January, 1909, between the appellee and the appellants, who were and are brokers, engaged in the business of buying and selling stocks, bonds and other securities for their customers, by which transaction there were sales by which the appellee parted with the ownership of certain railway stock and became possessed of certain railway mortgage bonds and stock therewith sold by appellants to appellees.

The transaction was had wholly by correspondence in writing, which appears from the evidence introduced by

the parties; and upon consideration of the evidence the court below entered the decree under review, whereby the court allowed the sales of the railway stock first above mentioned to stand, but held the appellants accountable for the actual proceeds of such sales received by them, including profits, and wholly rescinded the sale by appellants to appellee of the railway mortgage bonds and stock secondly above mentioned.

The material facts, as well as the principles of law applied thereto by the court below, appear from the opinion of the judge of that court, which is made a part of the decree under review, and which is as follows:

## *Opinion of the Court Below.*

"The plaintiff has brought this suit for the rescission of a certain transaction between himself and the defendants entered into in January, 1909, whereby the plaintiff lost title to 100 shares of the common stock of the Atlantic Coast Line Railway Company and became possessed of $10,000.00 of the five per cent first mortgage bonds of the Georgia and Florida Railroad Company, with forty shares of the preferred stock, and sixty shares of the common stock of the last named company.

"The defendants were and are dealers in stocks, bonds and other investment securities, and the plaintiff for a number of years prior to the time complained of had infrequently purchased stocks and other investments through the defendants and often at the suggestion or advice of them; and until the time and transaction complained of all investments made by the plaintiff through the defendants were reasonably profitable.

"During the time of these various transactions the plaintiff resided in Petersburg, Roanoke, or in or near

Charlottesville, Va., and the defendants in Richmond, Va., so that most of the transactions between them, certainly the transaction here complained of, were conducted by written correspondence.

"The correspondence from the plaintiff to the defendants justifies the statement that the plaintiff was constantly seeking the advice and judgment of the defendants in his dealings; for instance, on August 24, 1907, in making enquiries for an investment, among other things, he wrote defendants, 'This is rather out of my line for buying, but such stock, or stocks, or bonds that you know possess merit, and are founded on a good basis, and are willing to suggest such, I would be willing under your advice to buy this way.   Kindly let me hear from you.'

"In reply to this letter of August 24, 1907, defendants recommended that plaintiff buy 100 shares of the common stock of the Atlantic Coast Line Railroad, and immediately plaintiff sent defendants $2,000.00 and they, on September 2 or 3, 1907, purchased for plaintiff the 100 shares of the common stock of the Atlantic Coast Line Railroad at $8,300.00, and thereafter, defendants carried the stock for plaintiff, or in other words, defendants held this stock for plaintiff as security for the balance of the purchase money.

"In October and November, 1907, there was a very severe financial stringency over the country and all stocks depreciated on the market.   The market value of this stock went as low as fifty-nine and a fraction; that is to say, the stock sold below sixty dollars the share and of course the plaintiff had to put up with dedendants more money, or security to protect this stock purchase.

"From the time of the money panic in 1907 till January, 1909, the plaintiff wrote frequent letters to de-

fendants asking their opinion about the general outlook and especially asking their opinion about selling this 100 shares of Atlantic Coast Line Railroad stock. To all of such letters the defendants promptly replied, giving answer to all questions and advised against the sale of the Atlantic Coast Line stock.

"On January 11, 1909, defendants wrote plaintiff that they had received for him the semi-annual dividend of $250.00 on this Atlantic Coast Line stock, which amount plaintiff was given credit for by defendants.

"On January 14, 1909, plaintiff wrote defendants as follows: 'I have yours of the 11th advising me of the $250.00 Atlantic Coast Line dividend to my credit, which I am, of course, glad to hear. Could not enough more be spared from my now margin on the 100 shares you are carrying for me, without having to sell a part of my stock, to make the amount $1,000.00, as I need this amount to complete payment on a house now about completed, and don't wish to raise the money by mortgaging. Or would, if not, it be better to close out than wait for better prices on my stock. If I could make a sale of some of my realty, I could easily pay up everything and it has been my hope to do so, but everybody at present seems to be holding off. A prompt reply will oblige.'

"In reply, defendants wrote plaintiff on January 15, 1909, as follows: 'Yours of 14th received. You can draw on us for $1,000.00 if desired. We enclose herewith circular in regard to Georgia and Florida first mortgage five per cent bonds and would suggest that you sell the 100 shares of Atlantic Coast Line stock at 109 or 110 and buy $10,000.00 of Georgia and Florida first mortgage, prior lien five per cent bonds at par and interest in the bankers syndicate. A result of which you will receive $4,000.00 bonus in preferred stock and

$6,000.00 in common stock of the Georgia and Florida Railway.

" 'In the meantime the funds in your investment are absolutely protected by the first mortgage prior lien bond, and your profits would accrue through the increase in value of the stock, which would stand you at little or nothing.

" 'If you desire to do this, we can arrange to carry these Georgia and Florida bonds in place of the Atlantic Coast Line stock.

" 'Four of the largest trust companies in Baltimore subscribed to $100,000.00 or more of these bonds in the bankers syndicate.'

"On January 16, 1909, the plaintiff wrote defendants as follows: 'Yours of 15th just to hand, and I shall draw upon you for $1,000.00. In regard to change of investment, will say that in such matters I am guided by your greater knowledge and experience, and authorize you to sell my 100 shares as you suggest at 109 or 110, and buy Georgia and Florida first mortgage prior lien five per cent bonds at par and interest receiving as bonus preferred and common stock.

" 'Now, I owe some debt, *i. e.* $2,000.00 mortgage on my home, raised to continue to carry stock to prevent sacrificing same, and also about same amount in bank here. I don't like much debt, never before until panic had to borrow on my realty. I own considerably over, in first class real estate, $50,000.00.

" 'My debts are to you for $3,000.00 with collateral and at the bank here $2,000.00 and mortgage on my home $2,000.00. On March 2, $2,000.00 is due.

" 'What I am getting at in writing so freely is to apprise you of what I owe, and then let you decide for me, whether it would not be best to buy only what I can easily carry, to enable me to have cash enough to liqui-

date some of these debts that are bearing six per cent interest.

" 'To reinvest in $6,000.00 or $7,000.00 of these bonds with the bonuses, instead of as much as $10,000.00

" 'This will give me some ready money and leave enough for margin. As soon as I can make a sale of real estate I will invest and buy outright these bonds that you recommend.

" 'In the meantime carry what you    *    *    , on a margin that will make me safe.

" 'There would be no reason for not carrying the $10,000.00 if you think at the expiration of a month or two I could then sell at an advance, if so, do as you suggest to the extent of $10,000.00.

" 'I am not needing the money now with the $1,000.00 you authorize me to draw upon you for, but am apprehensive, if things do not improve, I might be embarrassed, and this I have never yet been in all of my life. I am very cautious and conservative in my nature and have found it to have been to my gain, for I am possessed of more than a generous father gave me twenty-five years ago. I am taking you somewhat in my confidence, and giving you facts, that you, as old and tried friends, may decide what is best in this matter. What you decide upon will meet my approval. I have two real estate deals pending, either one of which, if made, would give me more than enough to pay off every dollar I owe.'

"Upon the receipt of this above letter the defendants credited the account of the plaintiff on January 20, 1909, with the sale of 100 shares of Atlantic Coast Line common stock at $10,925.00, and charged the plaintiff with the purchase of $10,000.00 Georgia and Florida five per cent first mortgage bonds for $10,111.11 and on January 21, 1909, wrote plaintiff as follows: 'Yours of

of the 16th received.    We have sold for you 100 shares of Atlantic Coast Line common stock at 109½ and we charge you by the cost of $10,000.00 Georgia and Florida first mortgage five per cent bonds at par and interest, carrying a bonus of $4,000.00 in preferred stock and $6,000.00 in common stock.

*      *      *

" 'We are not recommending that you buy this for any temporary holding of three or four months but for you to make up your mind to hold it for at least twelve months, the bonds will pay their interest on 1st of May and November.

" 'Your draft for $1,000.00 has been presented and paid.

" 'Yours very truly,'

" 'P. S.    The Georgia and Alabama bond syndicate turned out about 100 per cent profit, and the Georgia and Florida goes thru a richer territory than the Georgia and Alabama.'

"And accompanying the letter defendants sent plaintiff a memorandum statement as follows:

" 'We have today sold you " '10,000 Georgia and Florida Syndicate subscription 100_____$ 10,000.00

" 'Interest 5% from November 1, 1908 __      111.11

$ 10,111.11

" '$10,000.00 Georgia and Florida Railway first mortgage 5a.

" '4,000.00 Georgia and Florida Railway preferred stock.

" '6,000.00 Georgia and Florida Railway common stock.'

"It now appears from the evidence that the Georgia

and Florida Railway paid interest on these bonds for a few years, and most if not all of the interest so paid was a fund set aside for the purpose and not from the earnings of the road.

"It also appears from the evidence, or from the defendants' answer, that the defendants on January 20, 1909, when it was thought they had sold for the plaintiff his 100 shares of Atlantic Coast Line stock, sold on that day only thirty-five shares and transferred the remaining sixty-five shares to their own stock account (sold it to themselves) and at the same time transferred from their own bond account, and stock account, the $10,000.00 first mortgage bonds Georgia and Florida and the $4,000.00 Georgia and Florida preferred stock and $6,000.00 Georgia and Florida common stock to the account of the plaintiff (bought from themselves for the plaintiff).

"The evidence further shows that defendants on February 5, 1909, sold ten shares of this Atlantic Coast Line stock at $109\frac{1}{2}$; on February 9, 1909, they sold ten shares at $109\frac{1}{2}$; and several months later they sold the remaining forty-five shares at a considerable advance.

[1, 4] "As I understand it, the law on this subject is very clearly established, for in *Ferguson* v. *Gooch*, 94 Va. at page 8, 26 S. E. 397, 40 L. R. A. 234, the court said: 'Nothing is better settled than that a man cannot be the agent of both the seller and the buyer in the same transaction, without the intelligent consent of both. Loyalty to his trust is the most important duty which the agent owes to his principal. Reliance upon his integrity, fidelity, and ability, is the main consideration in the selection of agents, and so careful is the law in guarding this fiduciary relation that it will not allow an agent to act for himself and principal, nor to act for two principals on opposite sides in the same

transaction. All such transactions are voidable and may be repudiated by the principal, without showing that he was injured. In such cases the amount of consideration, the absence of undue advantage and other like features, are wholly immaterial. Nothing will defeat the principal's right of remedy except his own confirmation after full knowledge of all the facts. Actual injury is not the principle upon which the law holds such transactions voidable. The chief object of the principle is not to compel restitution, where actual fraud has been committed, or unjust advantage gained, but it is to prevent the agent from putting himself in the position, in which to be honest is to be a strain upon him, and to elevate him "to a position where he cannot be tempted to betray his principal." Under a less stringent rule it was said by the court in *Porter* v. *Woodruff*, 36 N. J. Eq. 174, 80, fraud might be committed, or unfair advantage taken, and yet owing to the imperfections of the best human institutions, the injured party be unable either to discover it or to prove it in such manner as to entitle him to redress. To guard against this uncertainty all possible temptation is removed, and the prohibition against an agent acting in a dual character is made broad enough to cover all transactions. The rights of the principal will not be changed, nor the capacity of the agent enlarged, by the fact that the agent is not invested with a discretion, but simply acts under an authority to purchase a particular article at a specified price, or to sell a particular article at the market price. No such distinction is recognized by the adjudications nor can it be established without removing an important *safeguard* against fraud. *Buckles* v. *Lafferty*, 2 Rob. (41 Va.) 292, 40 Am. Dec. 752; *Howory* v. *Helma*, 20 Gratt. (61 Va.) 1; 1 Miss. Ins. L. (4th ed.) 244; 2 Pom. Eq. Jur. sec. 959;

1 Stor. Eq. Jur. sec. 315; Mechem on Agency, secs. 454, 455, 713; *Michoud* v. *Girod*, 4 How. (U. S.) 503, 11 L. Ed. 1076; Story on Agency, secs. 210, 211; *Raisin* v. *Clark*, 41 Md. 158, 20 Am. Rep. 66; Warvelle on Vendors, p. 862.'

[5] "In the recent case of *Cardozo* v. *Middle Atlantic Immigration Company, Inc.*, 116 Va. at p. 360, 82 S. E. 80, in discussing the same principle of law the court said: 'It is the duty of the agent to place his principal in full possession of the facts bearing upon his personal interest and relations to the subject and toward the prospective purchaser. It is not enough for the broker or agent to say that he thought his principal was advised as to all the facts, nor is it sufficient if he be able to point out circumstances from which an inference might be drawn that the principal knew or had means of knowledge. It may be true that the principal has suffered no injury by means of the ignorance of the facts, but the law makes no such inquiry. In order to remove temptation from the path of agents, as far as can be done, it stamps, from motives of public policy, all such dealings with the seal of its condemnation. Loyalty to his trust is the most important duty which the agent owes to his principal. Reliance upon his integrity, fidelity and ability is the main consideration in the selection of agents and so careful is the law in guarding this fiduciary relation that it will not allow an agent to act for himself and principal, nor to act for two principals on the opposite sides in the same transactions. All such transactions are voidable and may be repudiated by the principal without showing that he was injured. In all such cases the amount of consideration, the absence of undue advantage and other features are wholly immaterial. Nothing will defeat the principal's right of remedy except his own confirmation

after full knowledge of all the facts. *Boury* v. *Davis,* 111 Va. 581, 69 S. E. 1050, and authorities cited; *Francis* v. *Cline,* 96 Va. 201, 31 S. E. 10.

"On the same subject see *Halsey* v. *Monteiro,* 92 Va. 24 S. E. 258, p. 581, *Branch* v. *Buckley,* 109 Va. 784, 65 S. E. 652.

"The principle is very ably stated in a note by the reporter to the case of *Bucklee* v. *Lafferty,* 2 Rob. (41 Va.) at p. 302, 40 Am. Dec. 752, quoting from the remarks of counsel for the York Building Company in case of *York Building Co.* v. *Mackenzie,* 8 Brown Par. Gas. said he: 'It is the constitution of nature itself, and is as old as the formation of society, and of course it must be universal. It proceeds from nature and is silently received, recognized and made effectual wherever any well regulated system of civil jurisprudence is known. The ground on which the disability or disqualification rests is no other than that principle which dictates that a person cannot be both judge and party. No man can serve two masters. He that is entrusted with the interest of others cannot be allowed to make the business an object of interest to himself, because from the frailty of human nature one who has the power will be too readily seized with the inclination to use the opportunity for serving his own interest at the expense of those for whom he is entrusted. The danger of temptation from the facility and advantages for doing wrong which a particular situation affords, does, out of the mere necessity of the case, work a disqualification; nothing less than incapacity being able to shut the door against temptation where the danger is imminent and the security against discovery great, as it must be where the difficulty of prevention or remedy is inherent to the very situation which creates the danger. The wise policy of the law has therefore put the sting

of a disability into the temptation as a defensive weapon against the strength of the danger which lies in the situation.'

[6] "As will be seen, from the above authorities, nothing will defeat the principal's right of remedy except his own confirmation after full knowledge of all the facts.    But the burden of proof is on the agent, in a transaction of this character, to prove that the principal was fully informed of all the facts within the agent's knowledge.    *Jackson* v. *Pleasanton*, 95 Va. at p. 658, 29 S. E. 680.

[7, 8] "It is therefore necessary to ascertain what information was communicated to the plaintiff by the defendants.    Whatever it was, it was done by correspondence.

"The plaintiff was a customer of the defendants, who wrote plaintiff on March 6, 1907, among other things as follows:

" 'We are now organizing the Georgia and Florida Railway embracing about 350 miles of road in which the syndicate subscribers receive for every $1,000.00 invested $1,000.00 first mortgage five per cent fifty year gold bonds, $400.00 six per cent preferred stock, and $600.00 common stock.

" 'Should you desire to sell some of your Georgia and Alabama 5's and invest proceeds in the above securities we think you would be doing a wise thing.'

"On March 7, 1907, plaintiff replied and declined to make the investment.

"Defendants' letter to the plaintiff on January 15, 1909, is copied herein above from which it will be seen defendants wrote plaintiff that he could draw on them for $1,000.00 as he had requested to do and enclosed a circular in regard to the Georgia and Florida first mortgage five per cent bonds and advised plaintiff to sell

his 100 shares of Atlantic Coast Line common stock at 109 or 110 and buy the Georgia and Florida bonds. There is nothing in this letter nor is there anything in the circular, in my judgment, to indicate that defendants owned the bonds they advised plaintiff to buy, or that they would buy his Atlantic Coast Line stock, or any part of it.

"The plaintiff's letter of January 16, 1909, to the defendants advised them of plaintiff's financial condition very fully; he tells them 'that in such matters I am guided by your greater knowledge and experience and authorize you to sell my 100 shares as you suggest at 109 or 110 and buy Georgia and Florida first mortgate prior lien five per cent bonds at par and interest, receiving as bonus preferred and common stock,' and again: 'What I am getting at in writing so freely is to apprise you of what I owe, and then let you decide for me whether it would not be best to buy only what I can easily carry,' and further on he says: 'I am taking you somewhat in my confidence, and giving you facts, that you as old and tried friends may decide what is best in this matter.'

"It is true this letter authorized defendants to sell this stock at 109 or 110 and buy the Georgia and Florida bonds, but it is equally true that the letter stated that he was guided by their greater knowledge and experience and that he was giving them the facts that defendants as old and tried friends may decide what is best for him in the matter.

"By this letter plaintiff authorized defendants to sell his stock and buy bonds, thus expressly making defendants agents of plaintiff both to sell and to buy; but they were agents in this matter in whom the plaintiff was trusting and guided by their greater knowledge and experience and he expected them to decide what was best for him.

"In executing this agency to sell the stock and buy bonds, defendants sold thirty-five shares of this stock and bought (?) the sixty-five shares themselves. They did not buy any Georgia and Florida bonds for plaintiff, but simply transferred their own bonds to plaintiff's account and on January 21, 1909, wrote to the plaintiff the letter already copied and inclosed the statement also copied hereinabove. It would appear, therefore, unless the plaintiff ratified this transaction it comes under the influence of the authorities heretofore cited and quoted from, but before the plaintiff is bound by any ratification such ratification must be made after full knowledge of all the facts. Taking up first the sale of this Atlantic Coast Line stock, I believe the record shows that until the filing of the answer of L. M. Williams, one of the defendants, to the plaintiff's bill of complaint on April 8, 1918, the only information or knowledge the plaintiff had of the sale of the stock was contained in defendants' letter of January 16, 1909, to plaintiff to the effect they had sold the 100 shares of Atlantic Coast Line common stock at $10,925.00 and charged the plaintiff with the purchase of $10,000.00 Georgia and Florida five per cent first mortgage bonds, etc.

"Upon the filing of the said answer on April 8, 1918, the plaintiff for the first time it seems knew what had become of this stock, for on January 20, 1909, defendants sold only thirty-five shares of this stock at 109½ and 'took over the balance to their stock account' (sold to themselves the sixty-five shares at 109½); on February 5, 1909, they sold ten shares at 109½ and some months later sold the forty-five shares, but at what price the record does not seem to disclose. In my judgment it is apparent that defendants as agents of plaintiff were authorized to sell this stock and as agents only sold

thirty-five shares, and while agents bought the sixty-five shares they had as agents for sale. The defendants say that the plaintiff received the price he authorized them to sell at and he has not been injured. They say that Atlantic Coast Line on the New York stock market on January 20, 1909, was quoted at 108 or 108½ and that by their taking over the sixty-five shares they gave the plaintiff more than the stock could have been sold for on January 20. That defense does not meet the demands of the law, because the law says the plaintiff in a case like this can, on being informed of the facts, repudiate the transaction and recover. He does not have to show any damage. The fact that the defendants took over this stock at a point higher than it was that day quoted on the New York stock market; gave sixty-five dollars more for it than the New York stock quotation, rather weakens defendants' position. I do not believe such dealing is in accord with usual business methods and does not help the situation; but justifies the inference that the defendants were doing this in order to quickly enable them to buy for plaintiff their own first mortgage Georgia and Florida bonds, which they immediately did.

[9] "Now consider what information if any plaintiff had that defendants in executing his order bought their own bonds for him. So far as I can find in the record there is nothing to show that at this time, January 20, 1909, plaintiff knew that defendants owned any Georgia and Florida first mortgage bonds.

"It does appear, however, that defendants on March 5, 1907, wrote plaintiff among other things that they were then organizing the Georgia and Florida Railway of about 350 miles of road in which syndicate subscribers *receive* for every $1,000.00 invested a $1,000.00 first mortgage gold bond bearing five per cent with cer-

tain preferred and common stock bonus, and advised plaintiff to invest. On March 7, 1907, plaintiff declined the investment. This letter of March 5th to plaintiff is not proof that on January 20, 1909, plaintiff knew, or ever had cause to suspect, that defendants owned any of these bonds. The circular which defendants sent to plaintiff with their letter of January 15, 1909, when they advised plaintiff to sell the Atlantic Coast Line stock and buy Georgia and Florida bonds, contains nothing to inform plaintiff that they owned any of these bonds, nor is there anything in the letter of defendants to plaintiff of January 21, 1909, to inform him that they owned the bonds that defendants charged plaintiff's account with the cost of. But defendants claim with great confidence that accompanying this letter to plaintiff of January 21, 1909, they sent plaintiff a statement which is filed as an exhibit with the bill in which the plaintiff was told in language as plain as language can convey that defendants sold their own bonds to plaintiff. What is here referred to and relied on by defendants is a memorandum statement already copied in this opinion, is on a printed statement form and these words printed, 'We have today . . . . . for you' as filled out it is in the following appearance: 'we have today sold for you,' then follows the statement as above copied. The word 'sold' in the lower quotation is filled in in pencil and a pencil line drawn through the word 'for' as indicated. The defendants say this reads: 'We have today sold you,' and they rely upon that as giving plaintiff full information of all facts in their knowledge touching the sale of these bonds. Their letter of January 21, 1909, inclosing this statement to plaintiff and in which they would naturally have given plaintiff full information of how they as his agents had executed the trust conferred on them by him, does not

contain the information of the true facts.   It does not tell plaintiff they had taken themselves sixty-five shares of his Atlantic Coast Line stock they were instructed to sell, nor does it tell him that the bonds they were instructed to buy, and which the letter says they charged his account with the cost of, were their own bonds.

"The plaintiff says in his evidence in testifying about this memorandum statement spoken of and of the words 'we have today sold you' that he never noticed those words until the counsel in preparing the papers for this suit called his attention to it.   If the defendants, as they do, rely on ratification of plaintiff of the agents acts, the burden of proof is on defendants to show that plaintiff ratified their acts after full knowledge of all the facts.   I do not think the defendants have met such burden, and I do not think the plaintiff had knowledge of many of the material facts, until they were disclosed by this suit and even now the record does not show at what price defendants sold the last forty-five shares of Atlantic Coast Line stock.

[10] "Then again the defendants claim that they were mere instruments in the performance of an appointed service and not fiduciaries in the performance of trust, and having sold the stock at a price authorized by the plaintiff, he has sustained no legal damage.   In answer to this claim it is sufficient to say in the quotation from *Ferguson* v. *Gooch, supra,* it says: 'The rights of the principal will not be changed nor the capacity of the agent enlarged by the fact that the agent is not invested with a discretion, but simply acts under an authority to purchase a particular article at a specified price, or to sell a particular article at the market price.'   Nor do I think anyone can read plaintiff's letter of January 16, 1909, and say that defendants were simply instruments in the performance of an appointed service.

"The law as quoted from the case in *Cardozo* v. *Mid. Atl. Immigration Co. Inc., supra,* is 'It'may be true that the principal has suffered no injury by means of the ignorance of the facts, but the law makes no such inquiry. In order to remove temptation from the path of agents, as far as can be done, it stamps, from motives of public policy, all such dealings with the seal of its condemnation.' 'All such transactions are voidable and may be repudiated by the principal, without showing that he was injured.'

[11] "Whether the defendants regarded the letter of the plaintiff as confiding special trust in them, or simply authorized them as instruments in the performance of an appointed service, it is difficult to read plaintiff's letter of January 16, 1909, and reach a conclusion other than that plaintiff regarded them as old and tried friends and expected them to decide for him what was best in the matter. Under these circumstances, in my opinion, the defendants were agents coupled with the duty of exercising their best judgment in the matter, and consequently could not have been mere instruments for the performance of an appointed service.

"Therefore, interpreting the law of this case as I do, and applying the facts as I view them, I am forced to the conclusion that the plaintiff is entitled to have the transactions set aside.

"The defendants will be charged with the prices at which they actually sold to third persons the several blocks making up the one hundred shares of Atlantic Coast Line stock of the plaintiff, with interest from the dates of sale. The defendants shall have credit for any indebtedness as of January 20, 1909, of plaintiff to them for the unpaid purchase price of this Atlantic Coast Line stock; and they shall likewise have credit as of the several dates of payment of interest received by

plaintiff on the Georgia and Florida bonds.    The plaintiff will deliver for the defendants the Georgia and Florida $10,000.00 first mortgage bonds, and the preferred and common stock of the Georgia and Florida.

"A decree to this effect can be prepared.

"WILLIAM A. MONCURE."

*Eppa Hunton, Jr., E. R. Williams* and *Thos. B. Gay,* for the appellants.

*C. M. Chichester,* for the appellee.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court:

The opinion of the learned judge of the court below so fully and accurately covers the material facts and the principles of law applicable thereto that that opinion (quoted above), is hereby adopted as a part of the opinion of this court.    We shall add thereto merely the following observations upon certain points which have been especially urged upon our attention by the very able and earnest argument of counsel for appellees as having, in whole or in part, escaped the attention of the court below.

At the outset we will say that the cause has been fully presented and ably argued by counsel on both sides, which has greatly lightened the labor of the court.

[12] There has been no difference between counsel as to the principles of law applicable, and it has not been claimed in argument before us that the principles announced in the opinion of the learned chancellor, which we have adopted as aforesaid, are not the principles

to be applied in this cause. The main argument has
centered around the controversy as to whether the let-
ters of the appellants (the agents), especially of March
5, 1907, of January 15, 1909, the circular or prospectus
sent therewith, and the letter of January 21, 1909, and
the memorandum sent therewith (all dealt with in
said opinion), were so clearly and unequivocally ex-
pressed on the subject that they in fact conveyed, or,
when reasonably construed, must be taken to have con-
veyed to appellee (the principal) the information that
the appellants proposed to sell and did sell to him their
own mortgage bonds and the stock therewith.

On this point it is urged in argument for appellants
that the court below overlooked any consideration of
the aforesaid circular and also the postscript to the
letter of January 15, 1909. The opinion expressly
states that the circular "contains nothing to inform the
(appellee) that they (the appellants) owned any of
these bonds." The postscript mentioned was as fol-
lows: "Let us hear from you promptly if you desire to
avail yourself of this offer." This, as we think, added
nothing to the meaning of the letter itself of January
15, 1909, and hence mention of it in the opinion afore-
said was doubtless omitted as immaterial.

[13] It is also urged in behalf of applicants that the
court below overlooked any consideration of the follow-
ing paragraph in the letter of January 21, 1909, from
appellant to appellee, namely: "We have given you
this participation in the bankers syndicate, as we feel
that it is very safe and should bring you good profits
during the next twelve months." It is true that this
paragraph of this letter is not quoted in the opinion of
the court; but we think this omission was due to the
fact that the court found nothing in this (as we find
nothing in it) to change the meaning which the ex-

pressions in other portions of the letter were reasonably calculated to convey to the appellee, namely that the transaction was a purchase for him from some one else, with no information given, which can be said to be unequivocal, that it was a sale by appellants to appellee of securities belonging to them personally.

[14, 15] It is further urged in behalf of appellants that the appellee admits in his testimony that, when his attention was first called, after the suit was instituted, to the exact phraseology of the memorandum, he saw that it said "sold you," and "was utterly surprised;" from which it is urged that by appellee's own admission the phraseology of the memorandum was sufficient to, and would, have conveyed to him the information in question if he had read the memorandum when he received it, and, hence, that it did not do so, was due to his own negligence in not reading it, or, if he read it, in not comprehending its meaning, at the time he received it, and not to the fault of appellants. We cannot so regard the matter. It is apparent from the evidence that, as a matter of fact, the memorandum did not convey the meaning in question to appellee until after the suit was brought, when his attention was *for the first time* attracted to the precise phraseology of "sold you" contained in it. In view of the fact that the letters were the source to which the appellee would naturally look for information which the appellants might have sought to convey to him on the subject of the transaction, rather than the memorandum, which he would naturally infer had reference to the same and not to a different transaction from that which was the subject of the mutual correspondence, we do not think that the contents of the memorandum, when reasonably construed along with the letters of the appellants and in the light of the other evidence disclosing the

mental attitude of the appellee, can be said to have been such that it ought to have attracted the attention of the appellee at the time it was received, or prior to suit brought, in such a way as that it should have conveyed to him the aforesaid meaning which appellants claim it should have conveyed and which they thought that it and their letters did convey. As said in *Cardozo* v. *Mid. Atl. Immigration Co., Inc.,* 116 Va. pp. 360-1, 82 S. E. 80–87, included in the quotation from such case in the opinion of the court below: "It is not enough for the broker or agent to say he thought the principal was advised as to all the facts, nor is it sufficient if he be able to point out circumstances from which an inference might be drawn that the principal knew or had means of knowledge." For the communication from the agent to be held to convey by inference the information in question in such case, the inference must be so obvious that it is apparent that the principal "willfully shut his eyes to what he might readily and ought to have known." See *Pence* v. *Langdon,* 99 U. S. 578, 25 L. Ed. 420; in which the communications from the agent contained language more strongly warranting the inference in question than in the instant case.

[16] It is further urged before us for appellants that consideration was not given by the court below to the fact that the memorandum aforesaid showed that no commission was charged on the purchase of the mortgage bonds and stock therewith, which should, as it is claimed, have informed appellee that it was not a purchase for him, as he supposed, but a sale to him by appellants personally. We do not think that it can be said that appellee should have reasonably expected that such a memorandum would set out the commissions charged if it had been a purchase for him, and

that the inference must be drawn, from its not stating any commissions as charged, that it conveyed the information aforesaid. He would naturally expect the information as to commissions charged or not charged to appear in a different character of document, such as an account rendered by appellants.

[17] But one other matter in controversy need be specifically referred to by us. It is earnestly urged for appellants that the court below erred in allowing the appellee to recover beyond the market value of the sixty-five shares of the Atlantic Coast Line stock on the day of the sale of the thirty-five shares of such stock. The authority of the court for this allowance is found in the settled rule which is thus stated in 1 Mechem on Agency, sec. 1224, pp. 894–5: "The well settled and salutary principle that a person who undertakes to act for another shall not, in the same matter, act for himself, results also in the other rule, that all profits made and advantage gained by the agent in the execution of the agency belong to the principal. And it matters not whether such profit or advantage be the result of the performance or the violation of the duty of the agent if it be the fruit of the agency."

In the case of *Wagner* v. *Peterson*, 83 Pa. St. 238, cited for appellants, the question involved was merely whether the principal could recover of the agent broker certain extra commissions charged by the latter, which he had had to pay other brokers. The court held that it should have been left to the jury to say whether the principal had promised to repay the broker the extra commissions. And in that case there was an account of sales rendered by the agent broker to the principal, which showed that the broker had fully accounted for his actual receipts from the actual sales of the stock. The case is therefore not in point.

We will add in conclusion (what we feel that the long years of upright, honest and fair dealing of the appellants' firm, shown by the evidence, justly entitles them to have the court make), the following statement: It is not even alleged by the appellee, nor is there any evidence whatever in the cause, that the appellants acted in any other manner throughout the whole course of their dealing with appellee, including the transaction aforesaid involved in this cause, than in the most scrupulously honest and upright manner, in so far as their intention was concerned. They risked for themselves, and, at the time of the suit, had still invested many hundreds of thousands of dollars in the same mortgage bonds and stocks as those which they sold to the appellee; and they, in good faith, thought that they had made it plain to the appellee at the time of such sale that they were making such sale to him from their own holdings of such securities. But, for the reason of public policy set forth in the opinion of the court below, which we have adopted as aforesaid as a part of this opinion, we feel constrained to adhere to the established rule on the subject, which is also set forth in such opinion, the importance of which, as a matter of public policy, is so great, that it transcends in importance and supersedes all consideration of any individual interests involved in any particular case in which it does not affirmatively appear that the agent has in fact made the disclosure aforesaid to his principal which the rule as aforesaid requires.

The decree under review will be affirmed.

*Affirmed.*

PRENTIS, J., dissenting:

I dissent, not from the salutary principles upon which the majority opinion is based, but because I do not think they should be applied to the facts of this case.

## ON REHEARING.

Richmond, Va., January 17, 1924.

PER CURIAM:

This case is before us upon a rehearing.    The former opinion, delivered by Judge Sims, was handed down March 15, 1923.

We have carefully considered the oral arguments and written briefs submitted upon the rehearing, and notwithstanding the apparent hardship of the case, a majority of the court is satisfied that no other conclusion can be reached than that stated in the original opinion without serious impairment of the important principle upon which that opinion was based.    The decision as formerly announced is, therefore, adhered to now.

*Affirmed.*