### C. J. MEEKER & CO. *v.* CAPT. YORK AND OWNERS OF BARK HELEN & FRANCES.

The utmost good faith is exacted in all the dealings of an agent touching the interest of his principal—he cannot speculate upon his principal's property, nor take a position where his own interest must necessarily come in competition with that of his principal.

APPEAL from the Fourth District of New Orleans, *Reynolds*, J.
*Mott & Frazer* and *E. A. Bradford*, for plaintiffs.  *Singletor & Clack*, for defendants and appellants.

SPOFFORD, J.  The bark "Helen & Frances" arrived at Algiers on the 6th or 7th December, 1855, laden with a cargo of Trapani or Marsala salt, amounting to 14,414 bushels.

The plaintiffs say, that they were the ship-brokers employed to make the usual disbursements for account of the "Helen & Frances," and they have brought this suit against her owners for moneys thus advanced during the month of December, 1855,

The defendants admit the correctness of the account sued upon by plaintiffs, but set up a much larger claim in reconvention for damages said to have been caused to the owners of the bark and cargo by the wrongful conduct of the plaintiffs with regard to the sale of the cargo.

It is asserted in a brief filed on behalf of the plaintiffs, that they were not the consignees of the cargo.  There is no direct evidence upon this subject, although it is proven that the bark was consigned to the plaintiffs.

But as the case stands upon the record before us, we are compelled to infer from their own action, that the plaintiffs were the consignees of the cargo, or, at any rate, were clothed with power from the owners to contract for its sale,

On the 12th November, 1855, while the bark was yet in transit, and nearly a month before her arrival, the plaintiffs entered into a contract with *John Thomas*, to sell him "the cargo of ship Helen & Frances," say about 16,000 bushels Trapani or Marsala salt, of merchantable quality, to arrive in all this month or no sale, at 37½ cents per bushel."  We cannot presume, in the absence of evidence, that the plaintiffs assumed such an extraordinary right of control over a cargo not consigned to them with authority to sell.

The vessel not arriving in all the month of November, this contract of course ceased to be binding.

But, on the 28th of November, 1855, when, as contended by defendant's counsel, it might fairly be presumed, from the usual course of telegraphic communication with the Balize, that plaintiffs were aware the bark would not be in time for the contract with *Thomas*, they made a contract with *Samuel Bell*, to sell him "in all the month of December next 20,000 bushels merchantable Trapani or Marsala salt at 35 cents per bushel."

In the last named contract there was no allusion to the vessel by which the salt was to arrive, and the amount exceeded by nearly 6000 bushels the cargo of the Helen and Frances.

If this was not a mere aleatory contract—a wager upon the price of a particular kind of salt in all the month of December, the plaintiffs must have had in view some source from which to supply their vendee. They have not disclosed any other source which they then had a right to look to, save the cargo in question.

But, whatever doubt might otherwise have hung over the intention of the plaintiffs, in making the contract with *Bell*, has been dispelled by their own subsequent action. On the 10th December, 1855, they addressed to him the following note:

"Sir—We hereby tender to you the cargo of salt per bark Helen & Frances, now lying at the point Algiers from Trapani, on account of a contract made with you, through *Wheeler & Burke*, brokers, on the 28th November, 1855, and we require from you to state where the bark shall discharge the cargo. Please let us know by 11 o'clock to-morrow morning, otherwise we shall dispose of the salt and hold you responsible for the difference in price, and you will consider this notice as placing you legally in default."

[Signed]            " C. J. MEEKER & Co."

Meanwile, the price of salt had been rapidly declining. *Bell* offered the plaintffs $1000 to release him from the contract of the 28th November, which they at first refused. It would seem that, afterwards, the captain of the bark discovered that *C. J. Meeker & Co.* claimed the right of delivering this cargo, under their contract, to *Bell* at 35 cents per bushel and accounting to the owners for 25 cents per bushel, which they said was the then market value of this species of salt.

The captain refused to concede this right, and, the salt being then in the course of delivery, he notified *Mr. Bell*, not to pay the price to *C. J. Meeker & Co.*, as the owners claimed the full benefit of the delivery of their salt to him, under the contract of the 28th November.

Thereupon, the plaintiffs sent to *Mr. Bell* to know if he would renew his offer of $1000, for, a dissolution of that contract. He did so, and the plaintiffs appropriating to themselves this sum paid them by *Bell*, addressed the following letter to *Captain York:*

"NEW ORLEANS, 17*th December*, 1855.

Sir—You have refused us the disposition of the cargo of your vessel at 25 cents per bushel for the salt, which was the market price, or the highest offer that was made for the salt. We would have disposed of it and you have prevented. We, therefore, notify you, that we will have noting to do with the disposition of your cargo, that we will not take the salt ourselves, nor transact the business of your vessel."

[Signed]            " C. J. MEEKER & Co."

On the 9th January, 1856, *Capt. York* notified *Mr. Bell* that the cargo was discharged, and tendered the warehouse receipt, which *Mr. Bell* refused, on the ground that *C. J. Meeker & Co.* had cancelled the contract for a consideration paid them, and he was no longer bound.

On the 12th January *Capt. York* notified *C. J. Meeker & Co.* of this refusal and the ground thereof, and tendered the warehouse receipt to them upon the payment of 85 cents per bushel, less their commissions, with a warning that the salt would otherwise be sold at his risk and that of *Mr. Bell.* ·

The plaintiffs refusing to accept this offer, *Capt. York* proceeded to have the salt sold, after due notice to the plaintiffs and to *Mr. Bell*, for account of whom it might concern. The sale took place on the 19th January, 1857, at 18 cents per bushel, the highest value which it would then command.

The defendants reconvening, demanded a judgment against the plaintiffs for the difference between the value of the cargo at 35 cents and at 18 cents per bushel, less the commissions to which plaintiffs would have been entitled had they perfected the sale to *Bell*, and which are admitted to amount to $126 12. The difference in the value of the cargo at the two prices is $2450 38. The other charges in the account annexed to the reconventional demand, are proven to be correct, and amount to $358 12.

We are of opinion that the District Judge erred in not holding the plaintiffs responsible to the defendants for the additional charges incurred and the difference in the value of the salt as sold to *Bell* and that realized at the subsequent sale, less commissions, to wit: the sum of $2682 38, which, after allowing the plaintiffs their demand, the correctness of which is conceded, would have authorized a judgment against the plaintiffs for a balance of $1393 19.

The plaintiffs may be acquitted of any intention to defraud. But they assumed the position of agents for the owners in selling and tendering a delivery of their property. As agents, they could not sell to themselves the property of their principals. They do not pretend ever to have bought the cargo from the owners. It could, therefore, be only in the capacity of agents that they tendered this cargo of salt to *Mr. Bell* in part discharge of a contract made with him at 35 cents a bushel, without the assent of the owners, they could pocket no part of that sum save their lawful commissions for selling. The owners ratified, and wished to consummate the contract with *Bell*, who also on his part confessed his obligation to comply until he was wrongfully released against the wishes of the owners, by the plaintiffs, for a price which they have received and claim as their own.

*Uberrima fides*, the utmost good faith, is exacted in all the dealings of an agent touching the interest of his principal—he cannot speculate upon his principal's property. He cannot be suffered to take a position where his own interest must necessarily come in competition with that of his principal.

Under these familiar rules of equity as well as of law, applied to the facts heretofore detailed, we are compelled to reverse the judgment in this cause.

It is, therefore, ordered and decreed, that the judgment of the District Court be avoided and reversed; and it is now ordered, that the claim of the plaintiffs be declared extinguished by compensation, and that, after thus extinguishing said claim, the defendants have judgment against the plaintiffs *in solido* for a balance of one thousand three hundred and ninety three dollars and nineteen cents with five per cent. interest thereon from the 19th February, 1856, until paid, and the costs of this suit in both courts.