PONDER, Justice.
 

 The plaintiff brought suit against James M. Thomson, the defendant, for an accounting of his activities as her agent and attorney-in-fact, in the sale of certain stock of the Item Company, Ltd., seeking to recover $97,725, with legal interest from June 27, 1941, less a credit of $25,000, or any such sum as the court may fix and determine. The defendant answered the suit and the case was tried on its merits. The lower court gave judgment dismissing the plaintiff’s suit at her cost. The plaintiff has appealed.
 

 On July 3, 1935, Lynn H. Dinkins, a close personal friend of the defendant, executed the following power of attorney, which was duly accepted by the defendant with the stock referred to therein:
 

 “State of Louisiana:
 

 “Parish of Orleans:
 

 “Know All Men by These Presents:
 

 “That I, Lynn H; Dinkins, of New Orleans, Louisiana, hereby irrevocably constitute and appoint James M. Thomson of New Orleans, Louisiana, my attorney-in-fact.
 

 “(a) To transfer my common stock in the Item Company, Ltd., represented by certificates Nos. 12 and 13, each for two hundred fifty shares, on the books of said corporation, including the power to transfer said stock to my said attorney-in-fact.
 

 “(b) For me, and in my name, place and stead, to vote said stock at any and all meetings of stockholders of said company, as fully as I might or could if personally present, including the right to waive notice of any such meeting, and to execute any and all documents in connection with said stock, to exercise any and all powers which may be exercised thereunder.
 

 “(c) To sell my said stock on such terms and conditions as my said attorney-in-fact may deem proper, and to receive, and give full acquittance for the purchase price thereof.
 

 “(d) To use the said stock as collateral to secure any loan to my said attorney-in-fact, which loan is made directly or indirectly for the benefit of the Item Company, Ltd. Any and all persons accepting said stock as collateral shall be fully protected on the statement of my said attorney-in-fact as to the purpose of said loan.
 

 “In making any sale of, or loan against, said stock, my attorney-in-fact shall treat said stock as his own, that is, he may bor
 
 *98
 
 row against it on the same basis and in the same proportions as he borrows against his own stock, and may sell it on the same basis as he sells his own; it being the intent hereof that my said attorney-in-fact may use my said stock in any transaction or for any purpose, in or for which he uses his stock in said corporation, to the same extent as he uses his own. It is understood that my said attorney-in-fact owns or controls seventy-three (73%) per cent of the outstanding common stock of the Item Company, Ltd., and I own ten (10%) per cent; and that these percentages are to govern any loan made against said stock.
 

 “The powers herein granted shall vest irrevocably for a period of six months from the date hereof, and shall continue thereafter until revoked by me.
 

 “In witness whereof, I have executed these premises at New Orleans, Louisiana, this 3rd day of July, 1935.
 

 “(Signed) Lynn H. Dinkins
 

 “Witness:
 

 “(Signed) Rosemary C. McEntee
 

 “New Orleans, La.
 

 “July 3, 1935.
 

 “Received the stock described above for the purposes, and on the terms and conditions, above set forth.
 

 “(Signed) James M. Thomson”
 

 Prior to the delivery of the stock to the defendant, the certificates were endorsed by Dinkins, authorizing the transfer of the stock on the books of the corporation.
 

 Dinkins lived with the plaintiff, his sister. He began living with her some time prior to the year 1905 and continued to live with her until his death on January 8, 1938. The plaintiff was the universal legatee under the last will and testament of her deceased brother. Shortly after the death of her brother, she executed, in blank, a transfer of the stock, with power of attorney to transfer the stock on the books of the company, signing as sole heir and universal legatee under the last will and testament of Dinkins. This instrument was turned over to the defendant, who at that time had possession of the stock. After the stock was transferred on the books of the corporation in favor of the plaintiff, a similar instrument was executed by the plaintiff and was turned over with the stock to the defendant’s agent, and subsequently to the defendant. The defendant addressed a letter to the plaintiff on January 4, 1939, which reads as follows:
 

 “Mr. C. G. Robinson,
 

 “C. G. Robinson & Company
 

 “American Bank Bldg.,
 

 “Dear Mr. ■ Robinson:
 

 “On my return from the East I find your letter of December 22 and Mr. Franz’ letter of December 23 in which he acknowledges receipt of the stock transfer to Mrs. Robinson.
 

 “In connection therewith I will hold the stock for her in accordance with our conversation, - the substance of which was that
 
 *99
 
 I would hold the stock under the same conditions that I held it under authorization from Mr. Lynn H. Dinkins when he was living.
 

 “With very best wishes for á happy New Year for both of you, I am
 

 “Sincerely yours,
 

 “(Signed) James M. Thomson “Publisher.”
 

 Some time during the year 1940 there were negotiations had between James M. Hammond and his representative with various stockholders in the corporation, with the view of purchasing all of the outstanding stock. Having failed to reach an agreement for the purchase of all of the stock, these negotiations fell through.
 

 On June 11, 1941, the defendant addressed the following letter to the plaintiff and her husband, who were at that time at Saluda, North Carolina:
 

 “Mr. and Mrs. Cecil Robinson,
 

 “Saluda, N. C.
 

 “Dear Friends:
 

 “I have been so over-worked and jammed that I haven’t had the opportunity to see either of you for a long time, and now I am told that you both are in North Carolina and that Cecil will be up there for some weeks.
 

 “Cecil will remember that some time about June, 1940 some people started negotiations to try and take over The Item, buying up its outstanding stock. One of them went over to see Cecil, and it was my understanding that he offered something like $25,000 in bonds of some kind for the 500 shares of common stock that you have in the Item. That discussion ran on until sometime in October, when I found that they were not able to go through with the transaction and it was dropped.
 

 “Meantime, something over two months ago, some other people started a somewhat similar discussion that has dragged along for what now seems to be a very long time, but it may be that something will come of it, and if it does it may be desirable for me to act in connection with it.
 

 “As Cecil has audited the books of The Item for a good many years and is acquainted with our statements, and as we are having another audit made now he has a pretty fair idea of our operating conditions — as good as can be gotten from figures.
 

 “Of course if he or both of you had been here, and the time had come to discuss this matter I would either have discussed it with him, or Claude Rives, who is conversant with the situation, would have discussed it with him. As the matter stands, we have these shares of stock here in our safe, with power of attorney attached, but in anything I do with this stock I would want additional authorization from you. As this situation has developed now these people are talking of buying up the stock with a limited amount of money, less than the other people were talking about last
 
 *100
 
 year, but I think they have it in mind to pay cash, and that they may pay cash for the stock up to the amount of $25,000., i. e., 50^ on the dollar value for the 500 shares of stock.
 

 “The Paul Thomson Estate likewise has some stock that is somewhat similarly situated, and I am one of Paul’s executors.
 

 “The audit of the Item’s business including April 30th ought to be finished by the Robinson Company by Monday. They got us out a balance sheet as of that date. I do not know whether Cecil saw it or not. I do not know whether he would want to come back here to handle this thing himself, or whether he would want to send authorization to his own firm, to me or to Claude Rives in connection with it.
 

 “When I talked to Claude this morning he suggested that I write you, asking that you give me what authorization you feel like giving in connection with this, if you prefer to handle the matter as I have indicated.
 

 “Hoping that you all are having a very pleasant and happy time, I am,
 

 “Sincerely yours,
 

 “(Signed) James M. Thomson”
 

 On June 12th the plaintiff’s husband answered the communication, as follows:
 

 “Saluda, N. C.
 

 “June 12, 1941.
 

 “Dear Jim:
 

 “Just received your letter of June 11th. Myriam & myself hasten to give you full authority to handle the 500 shares of Item Stock in any way you may desire, I meant to have called on you before I left but I was more or less in a rush myself to get off, having made up my mind at the last moment. I am returning to New Orleans on June 30th & I sincerely hope you will be successful in closing a deal that will be satisfactory to you in every respect.
 

 “Our best love & wishes to Genevievie & yourself & I want you to know that Myriam & I both feel that you have been the truest friend to us we ever had.
 

 “With regards Your sincere friend
 

 “(Signed) C. G. Robinson”
 

 On June 27th the defendant addressed the following communication to the plaintiff and her husband, viz:
 

 “New Orleans, June 27, 1941.
 

 “My dear friends:
 

 “I have today gotten the enclosed check for $24,970.00 for your stock in the Item Company, Limited, 500 shares, which closes out our interest in it today, as you will see by the announcement.
 

 “I hope to have the opportunity of seeing you in North Carolina or visiting with you.
 

 “With affectionate regards from both of us.
 

 “Sincerely,
 

 “(Signed) James M. Thomson
 

 “Mrs. Miriam Dinkins Robinson
 

 “Mr. Cecil Robinson”
 

 
 *101
 
 • On May 30, 1941, the International Paper Company entered into a tentative agreement with the defendant to purchase the defendant’s 3,300 shares of common stock in the Item Company, Ltd. At that time the International Paper Company was endeavoring to acquire all the outstanding stock in the corporation with the view of creating a new corporation which was to take over all the assets of the Item Company, Ltd. and discharge all of the funded and bank indebtedness. The new corporation, the Item Company, Inc. was incorporated on June 24, 1941. On June 27, 1941, the new corporation purchased the defendant’s stock in conformity to the previous tentative agreement made between the International Paper Company and the defendant for a consideration of $90,000 cash, $10,000, represented by a promissory note, two promissory notes for $27,500 each and $400,000 of second mortgage bonds of the new corporation. The new corporation also agreed to employ the defendant in an advisory capacity at a salary to be agreed on and that the amount of the salary was to be credited on the balance of the indebtedness owed by the defendant and his wife to the old corporation. It was further agreed that in event of the defendants’ death that the indebtedness remaining due was to be cancelled. The defendant owed the old corporation at that time $97,932.70. It was agreed some time later between the parties that the defendant was to receive $7,500 per year, which was later changed to $2,400 per year, to be credited against the indebtedness with the understanding that the entire indebtedness was to be remitted if the defendant died before it had been liquidated.
 

 On June 27, 1941, the new corporation acquired all of the outstanding stock of the old corporation. The defendant sold the plaintiff’s stock on that date to the new corporation for a consideration of $25,000.
 

 On May 3, 1943, the plaintiff’s attorney wrote the defendant requesting an accounting in connection with the sale of the plaintiff’s stock. On May 10, the defendant answered this communication informing the plaintiff’s attorney that he, the defendant, was referring the matter to his attorneys. On May 20th, the plaintiff’s attorney wrote to the attorney of the defendant stating that it was difficult for him to understand the defendant’s position to the effect that he had not acted for the plaintiff in the sale of the stock as stated by him in a telephone conversation. On June 8th, the defendant wrote his attorney to the effect that he never personally handled the stock for the plaintiff nor received or handled any check for the payment of it. He stated in this letter that it was his understanding that plaintiff and her husband used, besides themselves, Mr. Claude Rives in all these transactions. On June 10th, the defendant’s attorney wrote the plaintiff’s attorney, enclosing the defendant’s letter of June 8th, stating: “As you will note Mr. Thomson states that he
 
 *102
 
 had nothing whatever to do with the sale of the Dinkins’ stock.” Claude Rives died some time in April, 1943, prior to these communications. Consequently, no information was obtainable from him at that time or when the case was subsequently tried. The letters of June 11th, 12th and 27th of 1941 show that the defendant sold the plaintiff’s stock. The defendant testified that the sale was consummated on June 27th in the office of his attorneys while he and others were present, but did Hot produce any witness who was present to show that any one else other than himself had sold the stock. Rives could not have sold the stock except under the direction of the defendant for the reason that the defendant was the only one who had authority to sell the stock. If the stock had been sold by another party under the directions of the defendant, it would not have relieved the defendant from making a full disclosure or from liability in case it was sold for less than the defendant received for his own stock. The record shows that Rives was representing the purchaser in assembling the stock and not the plaintiff in the sale of her stock. After communications and conferences between the attorneys of the opposing sides, the defendant’s attorney produced on January 15, 1944 an unsigned copy of an agreement, dated May 30, 1941, containing the terms of the tentative agreement entered into between the International Paper Company and the defendant in regard to the purchase of the defendant’s stock.
 

 The present suit was instituted on April 28, 1944. The suit is based on the ground that the defendant violated his agreement to sell the plaintiff’s stock for the game price that he received for his own, resulting in the damage claim which she now seeks to recover from the defendant.
 

 The defendant takes the position that the original power of attorney executed on July 3, 1935 was subsequently changed by an agreement between Din-kins and himself before Dinkins died. “Such subsequent agreement to control must appear with as much certainty and definitiveness as did the first conferring the mandate.” Cunningham v. Denis, 51 La.Ann. 902, 25 So. 531. The testimony of Mr. James Hammond is to the effect that the defendant told him that Dinkins gave him the original power of attorney, which was continued in effect after Dinkins’ death by agreement with the plaintiff. Mr. Hammond stated that the defendant .told him this on several occasions during the time that he was negotiating for the purchase of all the outstanding stock in the corporation in the year, 1940. The testimony of the plaintiff, her husband and the documentary proof point to the conclusion that the original power of attorney remained in effect. The only testimony .to the contrary is that of the defendant. Under the circumstances, we cannot escape the conclusion that the original power of attorney of July 3rd was in effect at the time of Dinkins’, death. We note that the
 
 *103
 
 lower court, in its reasons for judgment, arrived at this same conclusion. However, the lower court was of the opinion that the letters of June 11th and 12th modified or changed the terms of the agency. We cannot agree with the conclusion for the reason that there is nothing to show any intention to modify or change the terms of the power of attorney under which the defendant held the stock. It will be noted that the letter of June 11th states that the stock is held by power of attorney and, while the defendant asks for additional authority, there is nothing therein to indicate that the power of attorney was to be abridged or modified. The letter of June 12th, it will be noted, does not state what price will be accepted for the stock, but informs the defendant that he can sell the stock in any way that he desires-, which is practically the same expression used in the original power of attorney of July 3, 1935, that the defendant could sell the stock on such terms and conditions as he “may deem proper”. The defendant could not change the terms of the original contract, which had been continued by agreement between plaintiff and himself under the blank power of attorney, without the distinct and unqualified assent of the plaintiff. Smith Brothers & Co. v. DeLeon, 39 La.Ann. 70, 1 So. 304. From a reading of the letter of June 12th, it is apparent that the husband of the plaintiff contemplated that the defendant would sell the stock for. the same price that he had received for his own. If it had been otherwise, the acceptable price would have been stated. Undoubtedly the plaintiff and her husband were relying on the terms of the original power of attorney and expected the defendant to comply with them. They undoubtedly realized that the defendant was in a position to receive a better price for the stock than they could themselves. When the defendant wrote the letter of June 11th, he well knew that he had on May 30, prior thereto, entered into an agreement to sell his own stock, which agreement was formally executed on June 27th. Instead of disclosing this information to his principal, he informed her that some parties were talking of buying up the stock with a limited amount of money. He did not make the disclosure to his principal that the law requires. It is the duty of an agent to make known to his principal all the true facts that he has knowledge of concerning the transaction and the subject matter of the agency. The utmost good faith is exacted in all the dealings of an agent touching the interest of his principal. Meeker & Co. v. York et ah, 13 La.Ann. 18. It was his duty to .inform the plaintiff what he was receiving for his own stock. He well knew that the plaintiff and her husband were in Carolina and knew nothing about the negotiations for the purchase of all the outstanding stock in the Item by the International Paper Company. He did not even state in his letter of June 11th that the International Paper Company were the parties interested in purchasing the stock.
 

 
 *104
 
 The duty of an agent to disclose to his principal all the facts relating to the subject matter is so well settled that it almost requires no supporting authorities. However, we cite the following pertinent authorities :
 

 Mechem on Agency, 2nd Ed., Vol. 1
 

 Sec. 1207, p. 882.
 

 “Agent 'Must Fully Inform His Principal. — It is always the duty of an agent, as will be more fully seen hereafter, to fully inform the principal of all facts relating to the subject-matter of the agency which come to the knowledge of the agent, and which it is material for the principal to know for the protection of his interests. This duty, moreover, has a specific application in this connection which justifies a reference to it here. As has been already seen, it is absolutely essential, when an agent undertakes to sustain dealings with his own principal, that it shall appear that the agent frankly and freely gave to his principal full information respecting, not only the agent’s relation to the contract, but also, the various conditions respecting time, value, situation, condition and the like, which may fairly be deemed to be material 'in determining upon the desirability of entering into the contract. But even where the agent is not personally interested in the contract, his duty to give the principal full information of all the material facts relating to the transaction, which are within his knowledge, still exists. A failure to perform this duty, while not necessarily rendering transactions with third persons voidable, as it would do if the agent were himself personally interested, will still make the agent liable to the principal for any losses which he has proximately sustained thereby. Frequent illustrations are found in the cases in which agents for the sale of property, and the like, have permitted the principal to sell his property at a certain price without informing him of what the agent knew, namely, that he could procure better terms.”
 

 Sec. 1353, p. 993.
 

 “Duty of Agent to Give Principal Notice of Facts Material to Agency. — It is the duty of the agent to give to his principal reasonable and timely notice of every fact relating to the subject-matter of the agency, coming to the knowledge of the agent while acting as such, and which it may fairly be deemed material for the principal to know for the protection or preservation of his interests.
 

 “This duty may take on a variety of forms. As has been already seen, the duty of loyalty to his principal may require that the agent shall disclose to his principal the existence of adverse interests, either in the agent, or in others whom he represents, which are inconsistent with the full and fair performance by the agent of his duty to his principal.”
 

 Sec. 1188, p. 867.
 

 
 *105
 
 “Loyalty to his trust, the first duty of the agent. Loyalty to his trust is the first duty which the agent owes to his principal. Without it, the perfect relation cannot exist. Reliance upon the agent’s integrity, fidelity and capacity is the moving consideration in the creation of all agencies; in some it is so much the inspiring spirit, that the law looks with jealous eyes upon the manner of their execution, and condemns, not only as invalid as to the principal, but as repugnant to the public policy, everything which tends to destroy that reliance.”
 

 Sec. 1189, p. 867.
 

 “May not put himself in relations antagonistic to his principal. — -It follows as a necessary conclusion from the principle last stated, that the agent must not put himself into such relations that his own interests or the interests of others whom he also represents become antagonistic to those of his principal. * * *”
 

 3 C.J.S., Agency
 

 Sec. 138b, p. 8
 

 “Duty to Notify Principal of Material Facts. * * * Requirements of good faith and loyalty demand that in the principal’s interest it is an agent’s duty to make known to his principal every and all material facts which concern the transactions and subject matter of his agency, and on failure to do so he may be held liable in damages to his principal for any loss suffered or injury incurred as a result of such breach, although it has been held that by so doing the agent makes the obligation or claim his own on which he is liable to the principal as the third person would have been.
 

 “[Note] ‘No principle of law is better settled than that which requires the agent in all dealings concerning the subject-matter of his agency
 
 to
 
 act with utmost good faith and loyalty and disclose all facts within his knowledge which bear materially upon his principal’s interests. The rule that withholding information, when good faith and honest dealing require that it shall be given, is as culpable as misrepresentation as to facts concerning which good faith and honest dealing require the truth to be spoken is fully applicable to the relation of principal and agent.’ Jensen v. Snow, 131 Me. 415, 163 A. 784, 786.”
 

 Sec. 139, p. 9
 

 “Adverse or Individual Interests in General. * * * In accordance with the rule set out in § 138, good faith and loyalty to the principal’s interests require that an agent must not, except with his principal’s full knowledge and consent, assume any duties or enter into any transaction concerning the subject matter of the agency in which he has individual interests, or represents interests adverse to those of his principal. Accordingly it is the agent’s duty to act in matters touching the agency with due regard to his principal’s interest, since in accepting the agency he impliedly undertakes to give the principal his best care and judgment, and to use the power conferred
 
 *106
 
 upon him for the sole benefit of the principal consistent with the purpose of the agency. An agent should not, without the knowledge of his principal, engage in transactions with tend to bring his personal interest into conflict with his obligations to his principal, nor should he place himself in a position where his interests may become antagonistic to those of his principal, or speculate in the subject matter of the agency.
 

 “[Note] It is the duty of an agent to place his principal in full possession of all facts bearing on any personal interest and relations of the agent toward the subject of the contract and the other party to the transaction, and it is not enough to relieve the agent of liability that he is able to point out facts or circumstances from which the inference might be drawn that the principal knew or had means of knowledge with regard to such facts. Williams v. Bolling, 138 Va. 244, 121 S.E. 270.”
 

 When the defendant elected to sell the stock under the blank power of attorney held by him which had been executed to carry out the terms of the original agreement, he was bound by his contract to sell the stock at the same price per share that he was to receive for his own. He had so contracted and was bound thereby.
 

 The defendant contends that the plaintiff and her husband regarded her stock as being worthless and that stock of other minority stock holders having been sold for a like price that the amount received for the plaintiff’s stock was fair and just. What others may have received for their stock is beside the question. The defendant had control of the stock from the time the original power of attorney was first executed until the stock was sold, with the exception of the short time when the stock was transferred on the corporation books to the plaintiff. He held it under an agreement that required him, if he sold it, to sell it for the same price that he received for his own.
 

 Moreover, if the letters of June 11th and 12th were considered to have the effect.of changing the terms of the original power of attorney, which we do not believe they did, the defendant could under no circumstances be relieved from the duty of making the full disclosure to his principal the law requires.
 

 The defendant lays stress on the fact that the plaintiff and her husband agreed to sell the stock to Mr. Hammond or his representative for $5,000 cash and $20,000 in bonds in the year 1940. There is a conflict in the testimony with reference to who instigated the negotiations. Some of the testimony indicates that the defendant instigated them and some indicate that the plaintiff’s husband carried on the negotiations. The representative of Mr. Hammond testified that he had made an offer to the plaintiff’s husband which was not accepted until later when he wired them in North Carolina for acceptance and confirmation. The plaintiff and her husband
 
 *107
 
 wired this representative that they would accept the offer. However, it was never carried through because the purchaser had failed to acquire the defendant’s stock. Mr. Ballard, the editor of the corporation, testified that the purchaser and his representative requested him to contact plaintiff’s husband in respect to the purchase of the stock and that plaintiff’s husband had informed him at that time that the defendant had full control of the stock under an agreement. This testimony is of a statement made at an unsuspicious time. There is nothing in the record to indicate that the plaintiff or her husband had any knowledge of the amount that Mr. Hammond had offered the defendant for his stock. It is immaterial who instigated the negotiations at that time for the reason that it could have no effect on the subsequent transactions when the stock was actually sold. The principal has the right at any time to act unless the power of attorney precludes him from doing so. The stock still remained in the possession of the defendant until it was sold. There was never any attempt by the plaintiff to dispossess the defendant of the stock or withdraw the blank power of attorney which empowered the defendant to sell the stock and transfer it on the corporation’s books.
 

 The ■ defendant takes the position that the plaintiff has ratified his action. He contends that the plaintiff’s husband, being á member of the auditing firm of C. G. Robinson & Company, knew what Hammond had offered him for his stock because of a proposed income tax estimate drawn up by Landwehr, a member of the firm; and that plaintiff’s husband knew what the defendant actually received for his stock when it was sold because of an income tax return made by Mr. Landwehr a short time after the sale. The defendant does not contend that he ever informed either the plaintiff or her husband what he was offered or received for his own stock and it was only after repeated efforts of her attorney that such information was received. The record shows by two contracts executed in the year 1938 that Robinson was a silent member of the firm. The plaintiff and her husband both testified that they never received any information as to what was contained in the income tax returns. Their testimony is supported by Mr. Landwehr, who in effect stated that the plaintiff’s husband was inactive and had been for some time prior to 1938. His testimony is to the effect that he had not informed the plaintiff’s husband of the contents of the income tax returns. Another witness testified that the plaintiff’s husband was inactive in the firm. There is no testimony that plaintiff or her husband knew from any source what the defendant was offered or. received for his stock. Under such circumstances, this Court cannot assume, in the face of positive testimony, that the defendant or her husband had such knowledge.
 

 The plaintiff cannot, under the circumstances, be held to have ratified! the acts
 
 *108
 
 of the defendant by her silence in the absence of any knowledge of the material facts. The law of ratification is well stated in the following authorities:
 

 American Jurisprudence, Verbo, Agency
 

 Section 224. Ratification
 

 “Knowledge of material facts. — In order to bind a principal by ratification, assent, or acquiescence in prior acts of his agent in excess of authority actually given, a knowledge of the material facts must be brought home to him; he must have been in possession of all of the facts and must have acted in the light of such knowledge. If at the time of acts relied upon to show ratification the principal was ignorant of material facts involved in the original transaction, he may elect to avoid the ratification unless he later manifests a willingness to ratify regardless of the incompleteness of his knowledge. The rule pertains whether the want of knowledge arises from the intentional or the unintentional concealment or misrepresentation of the agent, or from his mere innocent inadvertence; if the material facts are suppressed or unknown, the ratification is invalid, because founded on mistake or fraud. Nor, according to the view which has been taken, need the principal make inquiries in order that he may know 1he material facts surrounding the transaction; it is sufficient to defeat the ratification that he does not in fact know them. Ratification of an antecedent act of an agent which was unauthorized cannot be held valid and binding where the person sought to be charged had misapprehended or mistaken material facts, although he may have wholly omitted to make inquiries of other persons concerning them, and his ignorance and misapprehension might have been enlightened and corrected by the use of diligence on his part to ascertain them.”
 

 Sec. 229
 

 “Ignorance of Unauthorized Act — The acceptance or retention of benefits derived from an agent’s unauthorized' act does not amount to a ratification of such act if the principal, in accepting such proceeds or benefits, does not have knowledge of all the material facts surrounding the transaction. * * *”
 

 Sec.
 
 236
 

 “Knowledge of Agent’s Unauthorized Act — In order that the silence of the principal following an unauthorized act done in his behalf by his agent, or his failure or delay in repudiating that act, may operate as a ratification, the principal must have had knowledge of the act and opportunity to dissent or repudiate. The authorities are unanimous in holding that there can be no ratification by acquiescence, silence, or failure to repudiate, unless the principal has full and complete knowledge of all the material facts attending the unauthorized transaction.”
 

 It has been suggested that the present suit was brought because the plaintiff became incensed at the defendant over a suit brought by the Item Company, Inc.
 
 *109
 
 against the firm of C. G. Robinson and Company and its individual members in the year, 1942, seeking to recover $138,000 for the negligence of the auditing company in failing to detect certain diversion of funds over a long period of time. The suit was compromised on-September 1, 1942 for $12,-000 and the services of the auditing company were retained. Robinson admits that he negotiated the compromise. He denied any negligence on the part of the auditing company and stated in effect that he entered into the compromise with the view of eliminating the nuisance of a trial and in order to retain the auditing business of the corporation for his firm. We cannot assume under these facts that the present suit was instituted solely because of the strained relationship between Robinson and the defendant.
 

 The defendant takes the position that he received an amount less per share for his stock than he received for the plaintiff’s stock. A copy of the defendant’s income tax return for the year 1941 is incorporated in the record. A return was made therein evaluating the amount received by the defendant for his 3,300 shares of stock for a total sale price of $555,000, which included the $90,000 cash he had received and notes and bonds in the amount of $465,000. The notes of $10,000; $27,-500 and $27,500 have all been paid. The defendant received $90,000 at the time of the sale, The defendant has already received $155,000 of the consideration. Insofar as the second mortgage bonds of $400,-000 are concerned, it would appear from the record that they are fully worth that amount. As we see it, the total value received by the defendant for his stock was $550,000 or $166,666 per share. The plaintiff is entitled to recover on this basis. Under such basis, her stock should have been sold for $83,333. Deducting the $25,000, already remitted to the plaintiff, leaves a balance of $58,333, which amount she is entitled to recover.
 

 Insofar as the $97,932.70, which represented the indebtedness -due by the defendant to the o-ld corporation, we cannot consider it as a part of the purchase price, because this indebtedness, under the agreement, was to be liquidated by a salary flowing from the services of the defendant.
 

 For the reasons assigned, the judgment is reversed and set aside and it is now ordered that there be judgment in favor of the plaintiff, Mrs. Myriam Dinkins Robinson, and against the defendant, James M. Thomson, in the full sum of $58,333 with 5% interest thereon from June 27, 1941, until paid. All costs to be paid by the defendant-appellee.
 

 HAMITER, J., concurs in the decree.
 

 O’NIELL, C. J., is of the opinion that the judgment appealed from should be affirmed.