680 So.2d 1320 (1996)
Calan Kiel WOODWARD, Plaintiff-Appellant,
v.
Peter L. STEED and Kathryn Sue Steed, Defendants-Appellees.
No. 28676-CA.
Court of Appeal of Louisiana, Second Circuit.
September 25, 1996.
*1321 Fischer & McMahon by Timothy Fischer, Shreveport, for Plaintiff-Appellant.
Barry G. Feazel, Shreveport, for Defendants-Appellees.
Before MARVIN, HIGHTOWER and CARAWAY, JJ.
MARVIN, Chief Judge.
In this action arising out of Horseshoe Casino's acquiring, by deed dated June 18, 1993, the several town lots comprising eight acres in Bossier City which now is the site of Horseshoe Casino's riverboat and facilities, the plaintiff and former owner of the eight-acre property, C.K. Woodward, appeals a judgment rejecting his demands based on mandate, lesion and fraud against Steed, who was serving as Woodward's mandatary, managing this and other Bossier property since 1990.
Steed had managed Woodward's properties and affairs in Bossier after Woodward moved out of Louisiana in 1990, and had attempted to find one or more buyers for the eight-acre property in 1992, as Woodward had instructed him. After others, including tenants, declined to make an offer through Steed for the property, Woodward verbally agreed in September 1992 to sell the property to Steed and another (Gore).
Steed was approached between December 12-15, 1992, by Horseshoe personnel about Horseshoe buying the eight-acre property for *1322 $250,000, but did not tell Woodward about the Horseshoe offer. After causing Woodward to give him a written agreement or "option" on December 16, 1992, to purchase the property for $125,000, Steed, in turn, sold an option for $25,000 on December 21, 1992, to Horseshoe to buy the property for $250,000. Steed then bought the property from Woodward on January 7, 1993, for $100,000, and sold the property to Horseshoe on June 18,1993, for $250,000.
The trial court correctly found that a mandate existed between Woodward and Steed, but concluded, erroneously, in our opinion, that a verbal buy and sell agreement between Woodward, on the one hand, and Steed and Gore, on the other hand, effectively "terminated" the mandate in September 1992, once Woodward executed the deed to Steed on January 7, 1993.
We find that the mandate was not terminated in September 1992, but was in effect during Steed's dealings with Horseshoe and with Woodward in December 1992 and January 1993.
After learning of Steed's June 18, 1993, deed to Horseshoe and consulting a Shreveport attorney, Woodward revoked Steed's mandate and made his initial demand in a letter to Steed written August 23, 1993.
Finding that Steed breached his fiduciary obligations to Woodward, we reverse and render judgment for Woodward, remanding and directing the trial court to require Steed to account for the profit he obtained. La. C.C. arts. 3004, 3005.

FACTS
C.K. Woodward, a native of Bossier, owned several lots and parcels of immovable property in the city and the parish. Woodward testified he left the area in June 1990, intending to keep his affairs and whereabouts unknown for an indefinite time until he succeeded in changing his sexual identity and his name from female to male. He explained his intentions to Mr. and Mrs. Steed, the defendant-appellees, who had been his friends and sometime neighbors for more than 10 years, asking them to manage his Bossier properties and affairs.
Mr. and Mrs. Steed, who then agreed with Woodward's request and thereafter began to act in accord with Woodward's instructions, shall hereafter be referred to singularly as Steed, he being the main actor in the circumstances out of which this action arose. Woodward apparently had accomplished his intention of changing his name and sexual identity to the masculine by the time this dispute arose.
Steed testified he upheld the "trust" Woodward placed in him in 1990 and considered Woodward as a part of his "family," maintaining Woodward's privacy and whereabouts, managing Woodward's properties, dealing with tenants and insurance matters, forwarding and receiving mail from Woodward, collecting rent paid by Woodward's tenants on the town lots, and making bank deposits for Woodward. Woodward sold to the Steeds the property they had been renting from him and assisted them in financing the construction of their home. After Woodward left the area in 1990, the tenants on the properties and others dealt solely with Steed, who then dealt, where necessary, with Woodward.
As Woodward expressly instructed him from time to time, Steed sought buyers for specific properties and negotiated with potential buyers. If Woodward agreed with the price offered for a specific property, Woodward signed the deed, which Steed then took to his local notary who would "notarize" Woodward's signature without Woodward being present. Steed testified he explained to the notary why Woodward was not present.
Woodward paid Steed $750.00 each year, 1990-1993, and additionally gave him $1,000 in 1992 shortly after Steed had negotiated and completed, as described above, Woodward's sale of a property in Bossier City to a buyer in June 1992. The annual $750 checks were written on an account that Woodward maintained as Tip-Top Properties, the last $750 check being written to Steed on May 25, 1993.
Woodward told Steed early in 1992 to seek a buyer for the lots in the eight-acre property, first from among Woodward's tenants on the property. Steed described how he followed *1323 Woodward's instructions. His effort with tenants on the town lots proved unsuccessful. Steed also attempted to negotiate a sale of a part of the eight-acre property to another individual (Beene) who sometimes speculated in real estate. This effort also proved unsuccessful.
Steed then contacted a friend, Alvin Gore, about purchasing the property. They agreed between themselves to offer to jointly purchase the property. Gore testified that he had no direct contact with Woodward, all negotiations being conducted by Steed with Woodward in September 1992. Steed said he told Woodward about Gore's interest and the price (Steed said $100,000) he and Gore were willing to pay for the property. Woodward did not want to sell the property until January 1993. Woodward "thought" Gore and Steed would then buy the property, but Woodward specifically denied taking the property off the market at that time. There were discrepancies over the price, whether $125,000 or $100,000, that was discussed between Steed and Woodward in September 1992. Even after the verbal agreement, Steed continued to manage all Woodward properties throughout that year, including the eight-acre property, as he had done in 1990 and 1991.
Steed testified that about mid-December in 1992 he learned from someone in the mayor's office that Horseshoe was interested in the property. "I told them [Horseshoe] I was not at liberty to divulge Woodward's location... And I said ... you need to talk to me because I have an option to buy the property." Steed's "option" was the verbal agreement in September 1992 with Woodward for him and Gore to purchase the property. Steed testified "I did not [then tell Woodward that Horseshoe was a potential buyer].... They [Horseshoe] asked me if it was possible for me to verify my verbal agreement ... with something in writing."
Steed said he responded by telephoning Woodward in Dallas about December 16, 1992, and "discussed" what needed to be written. This and other telephone conversations and faxes between them within a day or two led to two written agreements between Steed and Woodward, which are hereafter discussed.
Woodward first faxed to Steed on December 16, 1992, a "1st option to purchase" the property before March 31, 1993, which omitted the price to be paid and only provided a general description of the property. Steed then obtained a fax from Woodward of a "LETTER OF AGREEMENT," also dated December 16, 1992, which granted Steed "an exclusive option" to purchase the property (which was specifically described) for $125,000 and which additionally allowed Steed to transfer his option to any other party before the March 31, 1993, expiration date. This faxed "letter agreement" dated December 16, 1992, was retyped and signed and mailed by Woodward to Steed. Steed later had this letter agreement "notarized," without Woodward appearing before the notary in Bossier. This "agreement" was apparently satisfactory to Horseshoe and was thereafter filed for record on December 28, 1992.
A copy of these exhibits and of the option given by Steed to Horseshoe's agent dated and filed for record on December 21, 1992, are attached as an unpublished appendix to this opinion. Horseshoe paid Steed $25,000 for its option to buy the property from Steed for $250,000. Steed said he and Horseshoe signed that option on December 17, 1992.
Woodward testified that he and Steed arrived at Steed's option price of $125,000 in the second "agreement" because Steed said Gore was still involved as Steed's partner at the time. None of the written agreements, however, mentioned Gore.
Gore testified Steed contacted him "in late December [1992]" about Horseshoe's expressing its interest in the eight-acre property. Gore explained that he then withdrew from the deal because he did not want gambling in this area and did not want his name connected to the Horseshoe gambling casino venture. Gore said his commitment and friendship toward Steed led him to offer to lend Steed money to facilitate Steed's purchase of the property. Steed, however, testified that he showed to Gore on December 18, 1992, the three "options" mentioned above.
*1324 Steed said when he mentioned in his December 18 telephone call to Woodward a possible offer from "a third party [the undisclosed Horseshoe]," he "found it strange" that Woodward never asked who the third party was and that he thought it "odd" and "peculiar" that Woodward did not "wonder" if Steed would exercise his option to purchase if the "third party" did not pursue its dealings with Steed. Woodward testified that Steed continued to suggest that Gore was his partner in the venture, that Steed did not tell him until December 26, 1992, when Steed paid him $10,000, that Gore was no longer in the deal and Steed was buying the property solely for himself.
Adding to confusion about the date, Steed's father testified that he was present on the "fourth or fifth" of January 1993 in Steed's Bossier hardware store where Steed and Gore discussed their buying the property and Gore "declined" to stay in the deal, voicing his "objection to gambling."
Steed said that in the December 18, 1992, telephone conversation, "I probably did not say Horseshoe [to Woodward]" but "offered her [sic] the opportunity to pursue selling the property to a third interested party that had already approached me."
On December 26, 1992, the Steeds had driven to Dallas where they and Woodward exchanged Christmas presents and Steed paid $10,000.00 in cash to Woodward. Steed said he then informed Woodward that Gore was no longer interested in the property and explained that he paid the "$10,000 [in cash] to kind of reassure Woodward that I wasn't going to do what Gore had done." Steed further testified that he "didn't feel ... required to disclose" to Woodward at any time before he obtained the deed to the property on January 7, 1993, "the contacts with Horseshoe ... or the name Horseshoe," or the $25,000 Horseshoe paid for the option, or the $250,000 price of the property in Steed's option to Horseshoe, because he "assum[ed himself] to be the buyer in September [1992]." Steed said, "I didn't feel like [those details] were relevant"!
Armed with the "options" or written agreements from Woodward to him and from him to Horseshoe, all dated between December 16-21, 1992, Steed arranged to borrow $75,000 from a Shreveport bank. Steed then paid the balance of $90,000 to Woodward and obtained a deed to the property from Woodward on January 7, 1993.
In response to specific questions by the court, Steed said that it was some time after the January 7, 1993, deed to him from Woodward, when Horseshoe needed help in clearing title to the property, that he first mentioned the name of Horseshoe (or Binion's) to Woodward. Again Steed explained to the court that before January 7, 1993, "I did not volunteer that I, in fact, had sold an option or for what price or anything else. I didn't feel as though, as the buyer of the property, that I had an obligation to do so."

DISCUSSION
The dispositive issues in this case are the extent and duration of the fiduciary duty the mandatary, Steed, owed to his principal, Woodward, and whether, under the circumstances, that duty was either terminated or breached.
A mandate is an act whereby one gives power to another to transact one or more affairs for him. La.C.C. art. 2985. A contract of mandate is created when the mandatary accepts the mandate. La.C.C. art. 2988. La.C.C. art. 2990 places the burden of proving a contract of mandate upon the principal. The mandate may be made verbally or made in writing, and the mandatary may accept the mandate either in that same manner or by acting in accord with the mandate. La. C.C. arts. 2992, 2989. The mandate may be general for all affairs or special for one affair. La.C.C. art. 2994. A general mandate grants a power of administration. An express mandate is necessary if the mandate is to sell or perform another act of ownership. La.C.C. arts. 2996, 2997. The contract of mandate terminates when the purpose for which the power was created is accomplished or where the object of the power is disposed of by the principal. La.C.C. art. 3027(A)(8).
Generally, a claim to a real right in an immovable must be made with the formality of a writing. La.C.C. art. 1839. See Hayes v. Muller, 245 La. 356, 158 So.2d 191 (1963), *1325 and Ogden v. Ogden, 643 So.2d 245 (La.App. 3d Cir.1994). One cannot claim an interest in a real right and profits deriving from another's dealing with that real right by alleging a verbal agreement with the dealer to share in his dealings. Ogden, supra.
A claim based on the violation of a mandatary's duty to reveal material facts to his principal before buying his principal's property, however, is distinguished from the Ogden type claim. A mandatary who acts under an express mandate to sell cannot profit beyond what is due him under the contract even if the mandatary satisfies the principal's demands. See Foreman v. Pelican Stores, 21 So.2d 64 (La.App. 2d Cir. 1944). A mandatary is not allowed to speculate for his own profit in handling his principal's affair. Noe v. Roussel, 310 So.2d 806 (La.1975). The mandatary must disclose to his principal all facts relating to his principal's affair. Robinson v. Thomson 212 La. 186, 31 So.2d 734 (La.1947).
Unless the duty is dispensed with, the mandatary is required to account for his management. La.C.C. art. 3004. The mandatary must restore whatever he received by virtue of his procuration. La.C.C. art. 3005. The mandatary cannot take any advantage his position may give him to speculate for his gain. Neal v. Daniels, 217 La. 679, 682-683, 47 So.2d 44, 45 (La.1950).
This case does not question the validity of the transfer of the eight-acre property either to Steed or to Horseshoe. See generally Tedesco v. Gentry Development, Inc., 540 So.2d 960, 964 (La.1989); Hayes, supra; Ogden, supra.
Woodward asserts his claim on allegations of Steed's breach of his mandate and on fraud and lesion. We pretermit discussing fraud and lesion.
In distinguishing Hayes from Emerson v. Shirley, 188 La. 196, 175 So. 909 (1937), the Hayes court said:
As a basis for his allegations of fraud the plaintiff in the Emerson case argued that there existed between him and his vendee a fiduciary relationship to such an extent that the latter owed to him a duty (beyond that existing in the ordinary co-ownership relationship) to disclose pertinent facts about the property before purchasing his interest. The sole purpose of the introduction of the parol evidence was to show such fiduciary relationship and the resulting duty, and not that of enforcing an agreement so as to give him any benefits flowing therefrom.
We think that the above discussion suffices to distinguish Emerson ...

Hayes, 158 So.2d at 201.
Likewise in this instance, Woodward is simply asserting, and has proved, that a verbal contract of procuration or mandate existed and was breached by his mandatary. Woodward's circumstances do not offend La.C.C. arts. 2992 and 1839.
"[A mandatary] is bound to restore to his principal whatever he has received by virtue of his procuration, even should he have received it unduly." La.C.C. art. 3005. Even where an agent, who is authorized in writing to sell a thing for a particular price, sells the thing at a higher price, the surplus will belong to the principal, and the agent is entitled only to his stipulated commission. Foreman v. Pelican Stores, 21 So.2d 64, 69 (La.App. 2d Cir.1944), citing Denson v. Stewart, 15 La. Ann. 456 (1860).

THE MANDATE, GENERAL AND SPECIAL
The trial court correctly held that there was a general mandate of administration of Woodward's Bossier properties. This contract was created when Steed agreed to honor Woodward's stated wishes, as well as by Steed's acting in accordance with those wishes after Woodward left the Bossier area in 1990. Woodward annually paid Steed by check for serving as his mandatary, the last of which checks was written May 25, 1993. Without further belaboring the circumstances, we find that Steed generally conducted all of the dealings with tenants and others as Woodward's manager-administrator from 1990 until he was formally discharged and terminated by the letter of August 23, 1993.
*1326 While a breach of duty to his principal by a mandatary under a general mandate is legally sufficient for our result, according to the authorities cited and discussed supra, we find the contract of mandate was additionally a special mandate when Steed was instructed to "find a buyer for" a specific parcel of Woodward property, for which Woodward wanted Steed to solicit and relay to him offers to buy that property for a price negotiated through Steed. La.C.C. art. 2994.
The special mandate to find a buyer or solicit offers for the specific Woodward eight-acre property was accepted by Steed because he described how he acted in response to Steed's instruction, first soliciting Woodward's tenants and then attempting to negotiate with Beene about buying a part of the property. Steed apparently thereafter negotiated for himself and Gore to buy the property from Woodward and reached some sort of a verbal agreement in September 1992. Steed, however, solicited and relayed offers to buy a Woodward property during the course of his administration, general and special, in all instances except the Horseshoe instance.
Whether the contract of mandate between Woodward and Steed is either or both general and special, Steed must account for, and return to Woodward, the profit that Steed took for himself in the Horseshoe transaction. La.C.C. arts. 3004, 3005. Steed could not use his position to act contrary to, or to the detriment of, Woodward's interests:
Every one, whether designated agent, trustee, servant, or what not, who is under contract or other legal obligation to represent or act for another in any particular business or line of business or for any valuable purpose, must be loyal and faithful to the interest of such other in respect to such business or purpose. He cannot lawfully serve or acquire any private interest of his own in opposition to it. This is a rule of common sense and honesty as well as of law. The agent is not entitled to avail himself of any advantage that his position may give him to profit beyond the agreed compensation for his service. He may not speculate for his gain in the subject-matter of his employment.

Neal v. Daniels, 217 La. 679, 682-83, 47 So.2d 44, 45 (La.1950); see also Noe v. Roussel, 310 So.2d 806 (La.1975).
Steed's goal to profit on the Horseshoe offer arose solely because of Steed's position as the manager of Woodward's affairs, a classical conflict of interest contemplated in the Civil Code and case law. Steed learned of Horseshoe's interest in the property as Woodward's mandatary. When Horseshoe approached him in December 1992, Steed was still then managing the property for Woodward, and was legally obligated not to profit for himself to the detriment of his principal. The "purpose" for which the mandate was created was not "accomplished," nor had the "object" of the mandate been "disposed of" by the asserted September 1992 verbal agreement. La.C.C. art. 3027(A)(8).

WHY THE CONTRACT OF MANDATE DID NOT TERMINATE
We disagree that the mandate terminated in September 1992, when Steed and Woodward considered the property "sold," as the trial court found. We disagree for two reasons: The general mandate did not then terminate, but continued thereafter because Steed did not then acquire any real right in the eight-acre property, and Steed continued to manage all of Woodward's Bossier properties, including the eight-acre property, as he had before, dealing with tenants, collecting rent. Woodward expressly denied taking that property "off the market" and said he would have considered other offers to buy the property that were made or relayed to him from any source. Compare La.C.C. art. 3027(A)(8). The purpose of Steed's mandate, whether either or both general and special, continued after September 1992. The "object" of the mandate [the property] was not "disposed of" [sold or transferred] in September 1992. Under that mandate, however characterized, Steed was obligated to relay to Woodward the details of any later offer for the property, notwithstanding that Steed considered that Woodward had accepted in September 1992 the offer Steed may have then made to Woodward for himself and Gore.
*1327 The circumstances contemplated by La. C.C. art. 1839:
A transfer of immovable property must be made by authentic act or by act under private signature. Nevertheless, an oral transfer is valid between the parties when the property has been actually delivered and the transferor recognizes the transfer when interrogated on oath.....[emphasis ours],
are not the circumstances detailed in this record. That article simply validates the verbal transfer of an immovable where its conditions are met. This appeal does not question validity of the January 7, 1993 transfer of the property. This appeal concerns only Steed's breach of his obligations, as mandatary, to Woodward, as principal, in Steed's dealings with the property with Horseshoe.

CONCLUSION
A mandatary's duty of loyalty encompasses the duty to act with complete candor with one's principal while engaging in his business or acting for him. See Dauzat v. Simmesport State Bank, 167 So.2d 681, 685 (La.App. 3d Cir.1964), citing Robinson v. Thomson 212 La. 186, 31 So.2d 734 (1947). "The duty of an agent to disclose to his principal all the facts relating to the subject matter is so well settled that it almost requires no supporting authorities." Robinson, 31 So.2d at 740.
An agent must "fully inform the principal of all facts relating to the subject matter of the agency [which are] material for the principal to know for the protection of his interests." Dauzat, 167 So.2d at 685. Steed violated his duty to his principal by not informing Woodward of the specifics of Horseshoe's interest in the eight-acre property while continuing as Woodward's general mandatary [administrator-manager] of Woodward's properties, a general mandatary who also had a special mandate to find and negotiate with a potential buyer to purchase the eight-acre property for a price acceptable to Woodward.
We do not award the attorneys' fees sought by Woodward. The trial court did not find fraud.

DECREE
The judgment is reversed. Judgment is hereby rendered in favor of C.K. Woodward and against defendants, Peter and Kathryn Steed, under La.C.C. arts. 3004 and 3005, obligating defendants to account for and restore to C.K. Woodward the profits derived from Steed's breach of his fiduciary duty to Woodward. All costs are assessed to defendants-appellants.
The matter is remanded for further proceedings in accord with this opinion
REVERSED, RENDERED AND REMANDED.